# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROSEMARY WIRE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 06 C 6139 |
| | ) |
| SHOWBOAT MARINA CASINO PARTNERSHIP, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Showboat Marina Casino Partnership's ("Casino") motion for summary judgment and Plaintiff Rosemary Wire's ("Wire") motion to strike. For the reasons stated below, we grant the motion for summary judgment and deny the motion to strike.

## BACKGROUND

Wire alleges that on November 13, 2003, she was employed by the Casino and was a member of a crew on a vessel owned by the Casino. According to Wire, while she was working she sustained severe injuries to her spine and body. Wire further

1

contends that her injuries were the result of negligence and recklessness by the Casino in failing to keep the alleged vessel and adjoining structures in a safe condition. Wire brought the instant action and includes in her first amended complaint a claim alleging a violation of the Jones Act, 46 U.S.C. § 688 *et seq.* (Count I), a claim alleging failure to provide a seaworthy vessel and safe work environment in violation of general admiralty law (Count II), and a maintenance and cure claim (Count III). The Casino moves for summary judgment on all claims.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant

has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);  *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).  The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party.  *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

**DISCUSSION**

I.  Motion to Strike

    Wire moves to strike the affidavit of Captain Timothy S. Traynor ("Traynor"), who was the captain on the Winstar riverboat casino ("Riverboat Casino") where Wire worked.  Wire argues that statements included in Traynor's affidavit are not

supported by facts and that the Casino has not laid any foundation for Traynor's statements. Wire contends that Traynor's affidavit does not represent admissible evidence. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007)(stating that "[t]he evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial"). In his affidavit, Traynor states that he works for the Casino and is in charge of the Riverboat Casino. (Traynor Aff. Par. 1). Traynor also testified at his deposition that he is responsible for the entire crew and passengers on the Riverboat Casino. (Traynor Dep. 8). Thus, the statements included in Traynor's affidavit concerning the Riverboat Casino are not without an apparent basis. Traynor, in fact, specifically states in his affidavit that his statements concerning matters such as the intention of the Casino to keep the Riverboat Casino moored are based upon facts of which he was "personally aware." (Traynor Aff. Par. 13). Wire has not pointed to any evidence that would indicate that Traynor's testimony would not be admissible. The Casino has shown that Traynor has sufficient connections to the operations of the Riverboat Casino to be in a position to testify as to the matters in his affidavit based upon his personal knowledge. There is no rule that requires the Casino to lay out some sort of direct examination specifically explaining how the Casino will lay a foundation for every fact in the affidavit. Nor is there any rule that requires the

4

Casino to present the witness in the defense of the case in a manner that is desired by the plaintiff. Therefore, we deny the motion to strike.

We also note that Wire cannot prevail simply by seeking to strike the evidence presented by the Casino. At this stage of the proceedings, in light of the evidence pointed to by the Casino, Wire can no longer rely on the allegations in her complaint. Fed. R. Civ. P. 56(e). She must do more than simply attack the Casino's proposed defense by moving to strike the Casino's supporting evidence. Wire is required to point to sufficient evidence that she will present to the trier of fact to support her case. *See Springer v. Durflinger*, 2008 WL 540220, at *5 (7th Cir. 2008)(stating that "summary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events'")(quoting in part *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)). Wire is not entitled to proceed to the jury and ask the jury to speculate in the absence of evidence and rule in her favor. We also note that even if we were to grant Wire's motion to strike, the Casino has pointed to sufficient other evidence that the result in this case would remain the same.

II. Motion for Summary Judgment

The Casino argues that the Riverboat Casino on which Wire worked is not a

navigating vessel under admiralty law and thus, Wire cannot prevail against the Casino under admiralty law. An individual that is deemed a "seaman" can bring a cause of action against an employer for injuries resulting in the course of employment relating to negligence or intentional torts. *Howard v. Southern Illinois Riverboat Casino Cruises, Inc.*, 364 F.3d 854, 856-58 (7th Cir. 2004)(stating that "the Jones Act creates a federal negligence claim for any 'seaman' injured in the course of employment" and that "Congress enacted the Jones Act to provide seamen with heightened legal protection because of their exposure to 'perils of the sea'")(quoting in part *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995)); *Sobieski v. Ispat Island, Inc.*, 413 F.3d 628, 631 (7th Cir. 2005)(stating that "under the doctrine of respondeat superior, a Jones Act employer may be liable for the negligence or intentional torts of its employees"). A seaman can also sue an employer under general maritime law for failing to provide a seaworthy navigating vessel upon which to work. *Hughes v. ContiCarriers and Terminals, Inc.*, 6 F.3d 1195, 1197 (7th Cir. 1993)(stating that "[a]lthough the doctrine of unseaworthiness entails liability without fault, there must still be a defect in the vessel" and that "'[t]he standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service'")(quoting in part *Mitchell v. Trawler Racer, Inc.*, 362 U.S.

539, 550 (1960)).

Under general maritime law, a seaman can also bring a suit for "maintenance and cure" against her employer. *See Calmar S. S. Corp. v. Taylor*, 303 U.S. 525, 527 (1938)(referring to the "ancient duty of a vessel and her owner to provide maintenance and cure for seamen injured or falling ill while in service"); *Mullen v. Fitz Simons & Connell Dredge & Dock Co.*, 199 F.2d 557, 559-60 (7th Cir. 1952) (referring to "duty of maintenance and cure").

In order to recover under the Jones Act or general maritime law, a plaintiff must be deemed under the law to be a "seaman." *Chandris, Inc.*, 515 U.S. at 350 (discussing what "is necessary for a maritime worker to qualify as a seaman under the Jones Act" and indicating that "Congress intended the term to have its established meaning under the general maritime law at the time the Jones Act was enacted"); *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 487 (2005)(noting that "'seaman' is a term of art that had an established meaning under general maritime law," that "Congress took the term 'seaman' as the general maritime law found it," and that the construction of the term for the purposes of the Jones Act is made considering the "maritime law backdrop"); *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1995)(stating that "[t]o recover from his employer under either the Jones Act or the general maritime law, a plaintiff must be a 'seaman'"). In

order to be deemed a seaman, an individual must have had an "employment-related connection to a vessel in navigation." *Chandris, Inc.*, 515 U.S. at 357. The Casino argues that Wire did not have a seaman status since the Riverboat Casino is not a vessel in navigation.

### A. Evidence Pointed to by Wire

Wire has pointed to certain evidence that she believes shows that the Riverboat Casino is a vessel in navigation.

#### 1. Operation of Gambling Casino

Wire argues that the Riverboat Casino is a vessel in navigation since the Casino operates a gambling casino on the Riverboat Casino. (SAF Par. 2); (R SF Par. 8). However, that fact does not make the Riverboat Casino a vessel any more than a land casino is considered a vessel. The operation of a casino on the Riverboat Casino is actually support for not deeming it a vessel in navigation. The customers come to the Riverboat Casino in order to gamble, rather than to take a cruise on Lake Michigan or to use the Riverboat Casino as transportation to reach another destination.

## 2. Performance Capabilities and Equipment of Riverboat Casino

Wire also contends in statement of additional material fact number 2 ("Paragraph 2") that the Riverboat Casino is a vessel in navigation since it is "a gambling casino, carrying up to 4,250 passengers and crew on a Lake Michigan route. . . ." (SAF Par. 2). However, according to Wire's own admissions in response to the Casino's statement of material facts, Wire's statement in Paragraph 2 is inaccurate. Wire admits that after August of 2002, the Riverboat Casino never left the dock. (R SF Par. 8-9). Thus, Wire's contention that the Riverboat Casino is a vessel "carrying . . . passengers and crew on a Lake Michigan route" is an inaccurate statement. In actuality, the Riverboat Casino is at most capable of such a route. Wire also presents other facts concerning the engines and capabilities of the Riverboat Casino. (SAF Par. 2). However, such facts do not show that the Riverboat Casino was a vessel in navigation or that after August of 2002 it could have been one or will ever be one. Wire also argues that the Riverboat Casino is "capable of generating its own electrical power." (SAF Par. 13). However, Wire has not presented evidence to dispute the deposition testimony of Traynor that indicates that the Riverboat Casino uses power from its shore connections "98 to 99 percent of the time" and only uses its own power for emergency purposes. (Traynor Dep. 15). Wire also points to former voyages taken by the Riverboat Casino prior to August of

9

2002. (SAF Par. 19). However, such facts are a red herring that avoid the material issue, which is the status of the Riverboat Casino after August of 2002.

Wire also points out that the Riverboat Casino has items on it such as life preservers, fire extinguishers, bilge pumps, and fire fighting systems. (SAF Par. 17, 21). However, such features would necessarily prove useful for the safety of customers on the floating Riverboat Casino, and do not show that the Riverboat Casino was necessarily a vessel in navigation. Wire also points to evidence that indicated that on occasions during inclement weather Traynor would start the Riverboat Casino's diesel engines, put them in gear and use the propellers to stabilize the Riverboat Casino. (SAF Par. 14). However, Wire admits that the propellers were used "to stabilize" the Riverboat Casino. (SAF Par. 14). There is no evidence that the propellers were ever engaged to propel the Riverboat Casino away from the dock out into Lake Michigan as a vessel in navigation.

### B. Evidence Pointed to by the Casino

The Casino in turn points to evidence that shows that after August of 2002, the Riverboat Casino was not a vessel in navigation.

#### 1. Change in Indiana Law and Permanent Mooring

The Casino contends that a change in Indiana law provided the Casino with the opportunity to permanently moor the Riverboat Casino at its dock. Wire admits, pursuant to Local Rule 56.1, that in August of 2002 the State of Indiana "[a]mended its Riverboat gambling statute to allow riverboat casinos like the WINSTAR to stop cruising and to operate dockside." (R SF Par. 5-6). Wire also admits that "[a]s a result of the amendment to the Indiana Riverboat Gambling statute, and in accordance with what was allowed under the new Indiana law, Showboat's WINSTAR became *continuously moored* as of August 6, 2002." (R SF Par. 7)(emphasis added). The Casino asserts in paragraph 8 of its statement of facts ("Paragraph 8") that "[s]ubsequent to August of 2002, the WINSTAR has never left the dock and has never been used to transport passengers or cargo." (SF Par. 8). Wire responds by stating that "Plaintiff disagrees." (R SF Par. 8). However, the basis given by Wire for her disagreement is that the Riverboat Casino "is open 24 hours a day, 7 days a week operating as a gambling/casino vessel." (R SF Par. 8). Such facts, even if true, do not dispute the Casino's assertion in Paragraph 8 that since August of 2002 the Riverboat Casino has "never left the dock" and has never transported passengers or cargo. Thus, pursuant to Local Rule 56.1, the facts in Paragraph 8 are deemed admitted. *See Jankovich v. Exelon Corp.*, 2003 WL 260714, at *5 (N.D. Ill. 2003)(indicating that evasive denials that do not directly oppose an

11

assertion are improper and thus the contested fact is deemed to be admitted pursuant to Local Rule 56.1). Wire also separately admits in response to the Casino's statement of paragraph 9 that "at no time during the period of August 2003 through June 2005, when [Wire] worked on the WINSTAR, did the WINSTAR ever leave the dock." (R SF Par. 9).

### 2. Additional Connections with Shore

The Casino contends that it used additional means to secure the Riverboat Casino to the shore after it became permanently moored. Wire disagrees, arguing that after the Riverboat Casino was continuously moored, the vessel had the same sewer connections to the shore that it had prior to August of 2002. (R SF Par. 10). However, Wire acknowledges that after August of 2002, the Riverboat Casino was secured more firmly than before by the use of two winches on the bow and two hydraulic winches on the stern. (R SF Par. 10). Traynor also testified as to the additional measures taken to secure the Riverboat Casino after August of 2002. (Traynor Dep. 13-14).

### 3. Coast Guard Reports

The Casino also contends that in August of 2002, the Riverboat Casino was

"granted 'continuously moored' status by the United States Coast Guard." (SF Par. 12). Wire disagrees, contending that in October 2003, the United States Coast Guard ("Coast Guard") issued an activity summary report for the Riverboat Casino, indicating that the Riverboat Casino was still a "Passenger Ship" and "Gaming Vessel." (R SF Par. 12). Wire also claims that a Coast Guard inspection report made after August of 2002, indicated that the Riverboat Casino was authorized to travel out into Lake Michigan. (SAF Par. 3). However, Wire also acknowledges that another inspection report states that the "vessel is operating in a harbor and is exempt from underway manning requirements." (SAF Par. 4). Wire has also failed to dispute the fact that the Coast Guard activity report dated August 15, 2002, that the Casino has provided as an exhibit, states that the Riverboat Casino was granted a "'continuously moored' status." (Reply Ex. B 2). The report also notes that the "COI [was] revised as result of State of Indiana decision to allow dockside operation." (Reply Ex. B 2).

### 4. Atrium Alteration

The Casino also points to the deposition testimony of Traynor during which Traynor indicated that after the Riverboat Casino was permanently moored the Casino requested approval from the Coast Guard to close in the atrium area.

(Traynor Dep. 12-13). Traynor indicated that the Coast Guard approved the modification. (Traynor Dep. 12-13). Traynor further testified that the certificate issued by the Coast Guard indicated that the Riverboat Casino could not sail in the modified condition. (Traynor Dep. 12-13). Wire has not pointed to evidence that would dispute these points. The modifications made by the Casino, which made the Riverboat Casino ineligible for sailing approval, is another indication that the Riverboat Casino is not a vessel in navigation.

### 5. Intention to Maintain Permanent Mooring

Finally, the Casino asserts that it has no intention of ever moving the Riverboat Casino from its mooring. (SF Par. 13). Wire disputes that fact, arguing that the only citation that the Casino provides in support is a reference to the affidavit of Traynor. (R SF Par. 13). Wire argues that Traynor is merely the Captain of the Riverboat Casino. (R SF Par. 13). Wire contends that Traynor is not qualified to make such a statement since he "is not an officer of the Corporation that operates the vessel" and "he is not a decision maker about the operation or 'INTENT' of the vessel. . . ." (R SF Par. 13). However, nothing prohibits the Casino from presenting Traynor's affidavit as support for its contention concerning the intent of the Casino. While Wire apparently believes that the Casino should have presented an affidavit by

14

an owner of the Casino, the Casino is not required to present the exact type of evidence demanded by Wire. The Casino is merely required to present admissible evidence. *See Hemsworth*, 476 F.3d at 490 (stating that "[t]he evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial"). The Casino is the master of its own defense. If Traynor had acquired knowledge concerning the future intent of the Casino, then his affidavit could be used to support the Casino's assertion concerning its intent as long as the Casino avoids evidentiary pitfalls such as hearsay problems. There is nothing that requires the Casino to present some version of a direct examination foundation at the summary judgment stage of these proceedings. Nor is there any requirement that the court conduct some sort of mock trial to make some definitive determination as to whether certain testimony will be admissible. Thus, Wire is incorrect that the Casino's assertion concerning its intention to permanently moor the Riverboat Casino is without support.

We also note that the Casino, in response to Wire's criticism of Traynor's affidavit, has presented an additional affidavit from Joseph Domenico ("Domenico"), a General Manager of the Casino, in which Domenico states that Casino intends to keep the Riverboat Casino permanently moored. (Dom. Aff. Par. 15-16). The evidence that shows that the Riverboat Casino was docked as soon as it was allowed

under Indiana law, and evidence of the modifications made to the Riverboat Casino that made it unable to sail are further indications of the intent to permanently moor the Riverboat Casino. Wire on the other hand has failed to point to any evidence that shows that the Casino intends to ever move the Riverboat Casino from the dock and turn it again into a vessel in navigation. (R SF Par. 14); *see also Springer*, 2008 WL 540220, at *5 (stating that "summary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events'")(quoting in part *Steen*, 486 F.3d at 1022).

Wire has not shown that the Riverboat Casino has ever left its dock since August of 2002 when the Indiana law changed. Nor has Wire presented any evidence that shows that the Casino is contemplating taking the Riverboat Casino out into Lake Michigan as a navigating vessel. Wire has not even posited any reason why the Casino would want to take the Riverboat Casino out into Lake Michigan as a navigating vessel. Based upon the above facts, we conclude that the evidence clearly shows that the Riverboat Casino cannot be deemed a vessel in navigation since August of 2002, during the pertinent period in this action. This conclusion is consistent with the holdings in cases of the Seventh Circuit and the United States Supreme Court. *See Stewart*, 543 U.S. at 494 (stating that "[a] ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at

anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again")(citing in addition *Pavone*, 52 F.3d at 570 for the proposition that a "floating casino was no longer a vessel where it 'was moored to the shore in a semi-permanent or indefinite manner'"); *Howard*, 364 F.3d at 858 (stating that "the undisputed facts doom the plaintiffs' claims" since the casino in question "was an indefinitely moored dockside casino at the time of the alleged injuries and was never moved except to be tested"). Therefore, we grant the Casino's motion for summary judgment. We do not mean to downplay any injury that Wire may have suffered. However, she did not have the status of a seaman and thus is not entitled to the relief sought under the Jones Act and general admiralty law in this case.

## CONCLUSION

Based on the foregoing analysis, we grant the Casino's motion for summary judgement and deny Wire's motion to strike.

                                           _____
                                           Samuel Der-Yeghiayan
                                           United States District Court Judge

Dated:   March 20, 2008